I'd like to reserve two minutes for rebuttal. Sure. Thank you. Good morning, may it please the court. My name is Alif Kellis, and I represent the petitioner Teresita Naputi Tobita. Ms. Tobita entered on a KFLSA visa back in 1995. She was petitioned by a U.S. citizen named Melvin Naputi. The issue in this case is whether the immigration agency or the immigration judge could have granted her the green card, despite the fact that Melvin Naputi abandoned her after their marriage. To be eligible for a green card, a K1 fiancé has to complete four steps. Step one, she must obtain the K visa abroad at a U.S. embassy or a U.S. consulate. Therefore, she must meet the U.S. citizen that would petition for her, and they need to have the intent to get married within 90 days of entry into the United States. Step two, they must actually marry within 90 days. If there is no marriage, then the foreigner must leave or be removed. Step three, if the couple does marry, then the non-citizen spouse can take the third step and apply for a green card called adjustment of status. And step four is that she would be adjusted as a conditional permanent resident, and after two years as a conditional permanent resident, the non-U.S. citizen spouse can apply to remove the conditional tag. In Ms. Tapita's case, she complied with all three steps and never got to step four. She arrived on August 25, 1995, with a K1 fiancé visa. She married Melvin Naputi on August 25, 1995, two months of entry. Therefore, she complied with the 90-day rule. Then in October of 95, she filed an application for a green card to adjust her status to a conditional permanent resident. However, sometime in December of 1995, Melvin Naputi left for Guam, and he did not appear for two scheduled interviews with the immigration agency. Ms. Tapita attended the interviews herself without Melvin Naputi. The immigration gave her an opportunity to have Melvin Naputi come to the interviews, but she had no idea where Melvin Naputi was. She told the immigration agency, I know he left for Guam because his mother was sick, but I have not heard from him since he left, and I'm pregnant. The immigration agency did not believe that the child was Melvin Naputi's. In 1997, the immigration agency denied her application to become a conditional permanent resident. The immigration agency said that you failed to show that you have a valid marriage, and Melvin Naputi did not show up for the interview. And furthermore, the immigration agency alleged that Melvin made no attempt to contact Ms. Tapita or be there for their son's birth. Christopher Naputi was born on August 25, 1995. His birth certificate indicates Melvin Naputi as the father. August 25, 1995, wasn't it the date of the marriage? You're right. I take that back, Your Honor. I apologize. He was born in August of 1996, one year after the marriage. He was born on August 7, 1996. Counsel, so she didn't appeal the denial of the adjustment based on the first marriage. That's the problem. She was placed in removal proceedings by the immigration agency, and there was some discussion that I found in the transcript where there was a discussion. It might have been off the record. The judge said, well, she's no longer married to Melvin Naputi, who's the one who petitioned for her K-1 visa. I don't see that I can really do anything. I believe that's what was in the record. The judge didn't believe that he had any authority to review the denied application for adjustment. But by the time she was in front of the judge, she had a court-ordered DNA test result that showed that Melvin Naputi was the father of Christopher. So the judge could have reviewed the denied adjustment. He had the authority to. Did she ask him to? Not outright, no. But at that time, it would have been futile to. We know that both the agency and the courts were interpreting 245D of the Immigration and Nationality Act to require that the parties still be married at the time that the adjustment application is adjudicated. It was interpreting 245D that the couple remain married until the immigration agency got around to interviewing them up until this court decided CHOIN in 2008. Now, is there a motion to reopen before the BIA? Yes, there is. And what is that based on? We would like the board to review the case in light of the decision in CHOIN v. NKC, whether an abandonment can be analogous to a divorce before the immigration agency approves the adjustment status application. So it's still based on the first husband? You're not trying to adjust based on the second husband? Well, our first argument is that she should be eligible to adjust status under 245D just for statutory interpretation that only the marriage needs to take place. She doesn't have to have a spouse come with her to an interview if he's abandoned her. Our alternative theory is that she has remarried a man named Kenneth Tobita, and they're living in Hawaii, and he's raised Christopher all these years. Our second theory is that she can perhaps use the 245I adjustment statute, and the attorney general can use the 245I to adjust her as a conditional resident under Section 216 of the Immigration and Nationality Act. Wouldn't we have to overrule one of our own cases to reach that result? Yes, Your Honor. Can we do that as a three-judge panel? I'm uncertain, Your Honor. Well, I'll tell you. So you're out of the uncertainty. We cannot. Do you think Kalau was correctly decided? In that case, yes, it was because the petitioner in that case didn't complete Step 2 of the K-1 process. She entered the United States to marry a U.S. citizen. She didn't. She married somebody else. So you're saying Kalau is distinguishable? Yes, Your Honor. Did you just tell them today that you think it would have to be overruled? I think that there was a second argument in Kalau that she should be eligible under 245I to adjust with the spouse that did not petition her. The attorney in that case said, well, she didn't marry the U.S. citizen that petitioned for her under the K-1. Now she's married to somebody else. She can use 245I to be granted status through the new spouse. But in that case, the attorney didn't argue that she could use 245I in conjunction with the 216, the conditional residence, through the first marriage? On your first argument, if I understand it correctly, what you're saying is that you should be able to — that Ms. Tabita, Ms. Napudi Tabita, should be able to adjust her status because her first marriage to Mr. Napudi met the requirements of 1255D because she married Mr. Napudi. Absolutely. And that no further proceeding such as determination whether the marriage was bona fide was necessary. Is that correct? By the time she was in front of the immigration judge, there was enough evidence that the marriage was bona fide. All right. Now, did you raise that issue before the Board of Immigration Appeal? I did not represent her before the Board. I suppose I should rephrase that question. Did Ms. Napudi Tabita raise that issue? Because if she didn't, then under the NIMA, we lack jurisdiction to review it. Now, so I know you didn't represent her there, but can you tell us whether that issue was raised adequately before the BIA one way or the other? Her attorney wrote a notice of appeal and stated some of the issues that he would address on appeal to the Board, and he did comment that Ms. Tabita had married Melvin Napudi and complied with Section 1255D, Your Honor. 1255D. And that was the sole mention of that issue by that attorney, including no mention in the brief before the BIA? He did mention the Section 1255D in the brief. He kept arguing that Ms. Tabita couldn't adjust through the second spouse. I think that he developed the idea. Wait a minute. That's a different argument. The question is, let me repeat myself and see if I can be clearer, and you can answer me yes or no. As to the validity of the first marriage and the INS's then determination that the marriage was not bona fide, was there a claim made and brought before the BIA that that marriage was indeed valid and the INS was wrong in finding it to be a meretricious marriage? The appeal did not articulate that exactly, Your Honor. I didn't think so. But I believe in a footnote the Board must have contemplated whether she's eligible to adjust through Melvin Napudi because in a footnote the Board made a statement that because she could produce evidence of the DNA test years later, that can't be ‑‑ she can't use that because the evidence just wasn't presented timely. The evidence that Melvin ‑‑ Was that the sole mention of the contestability of the determination whether the marriage was meretricious? I'm sorry, Your Honor? Was that the sole mention of any evidence tending to make the marriage valid? By the Board, yes. So what would you like us to do? What the petitioner would like, Your Honor, is for an opportunity that she can present arguments that her case is analogous to the petitioner in Choyne and perhaps to remand the case to the Board so the Board can determine what effect Choyne has on Tavita's case. So Choyne was decided much later than the BIA decision in this case. So the Board didn't really have a chance to consider it. That's right. It didn't have a chance. And couldn't really make the argument based on Choyne since it hadn't yet been decided. That's correct. And I have contacted Chief Counsel's Office in Honolulu. I wanted them to join me in a motion to reopen based on this new case law. They never contacted me back, and the government has not agreed to join in a motion to reopen. So the motion to reopen that's pending is not joined by the government. I must be mistaken, and correct me if I'm wrong, but in Choyne v. Mukasey, it cited Kalau's approval and stated, there's no question in the plain language of 1255, bars K visa holders from adjusting to permanent resident status on any basis other than the marriage to the citizen who petitioned on their behalf. Words penned by my learned colleague, Judge Pragerson, sitting on my right. That's correct. How does Choyne help you? What did you say to me? I said you were a learned colleague. Thank you. We were saying you wrote Choyne. And sitting on my right, which is unusual. Come on, let's not get silly now. That's right. That is the test of language. I don't think Kalau is correct, so I'd have to disagree with that statement. I think if you look at legislative history, I realize now the regulations also hold that and follow Kalau, but I don't think Kalau was correctly decided. If it is good law, it does preclude that argument. The argument for the 245 IR? Yes, if it is good law. And, you know, obviously we can't do anything about it unless we go en banc on it. What did we hear from the government? Thank you, Your Honors. Thank you. Two bad opinions by one judge. Good morning. Good morning. May it please the Court, Alyssa Gould on behalf of the respondent, Attorney General Eric Holder. Petitioner Teresita Napudi was admitted to the United States on a K-1 nonimmigrant fiancé visa. Let me interrupt you, if you don't mind. Yes, Your Honor. Because we're all kind of in a sleepy mood. But why doesn't the government join in the motion to reopen? I mean, it seems clear from this record that this was a bona fide marriage and all the requirements were met. The 90-day period was met. They had a child together. The child was born. It was conceived after the marriage. And the child is an American citizen. And it doesn't appear to me that she was the one that broke up the marriage. He kind of walked away and then went back to Guam. And that, at the very least, we ought to give her her green card under that conditional approach that we have. So what's wrong with doing that? Well, respectfully, Your Honor, I don't think that it's completely clear that the marriage was, in fact, bona fide. It is true that they did have a child together who was born while they were still married. However, that wasn't the sole reason for INS's denial of the adjustment application. There was additional evidence in the record suggesting that, in fact, the marriage was not bona fide. For example, they lived at separate addresses. She was unable to contact him. What did you say? They did separate what? It appeared at the time that she had her adjustment interview that they actually resided at different addresses. It mentions this both in pages 198 to 201 of the record, which is the first adjustment denial, and pages 306 to 308, which is the denial of the second I-130 application. But be that as it may, the fact is that her, as one of you mentioned earlier, the initial adjustment application was never reviewed by the agency. She never renewed her application before the immigration judge, and the agency has never considered the question of whether that marriage was bona fide. In fact, the first marriage? The first marriage, yes. So it's never considered that? The agency has never reviewed that first adjustment denial and has suggested at times that perhaps Wait a minute. You're saying two different things. I'm sorry. Are you saying that the agency has not determined the first marriage was not bona fide, or that it has determined but not reviewed bureaucratically of the change? To be very clear, the INS determined that the first marriage was not bona fide. The immigration judge, and therefore the board, never reviewed the INS's determination. So that was an administrative decision? Yes, when she was interviewed in conjunction with her first adjustment application. So then it goes to the IJ, and what did he do? He didn't review it? Actually, she, in this case, never reviewed that first adjustment application. By the time the case got to the immigration judge, Ms. Napudi had already been divorced and filed her second adjustment application. So the agency, and she appears to have chosen, for example, if you look at page 58 of the record, she appears to have chosen the route of hoping to adjust through her second marriage. So when the immigration judge asked her, can I review the first adjustment denial, that never came to fruition. And so the agency has never made any attempt to review the first adjustment application. Okay, so then isn't that what the motion to reopen focuses on? If I understood counsel correctly, the motion to reopen focuses on this case, this court's decision in Choyne. And this court can choose to apply its own precedent, both Choyne and Calal in this case. So let me ask you something. The IJ decision that we have says, he says, had the service known, this is the, he's talking about the INS, right? I understand. Had the service known conclusively regarding Christopher's paternity at the time of the district director's decision denying adjustment, it may have been a different decision and adjustment may have been granted. Unfortunately, the paternity report wasn't completed until afterwards. And so there was no case law as to whether he could go back and look at it. I mean, I didn't see that part of this case. But why wouldn't the BIA or the IJ consider that now, given the equities? Or do you think it will on the motion to reopen? I think on a motion to reopen, the fact is that the case law, as well as the statute, is very clear. I think it would be impossible at this point, given that it was never exhausted and for multiple other reasons, to go back to the initial INS determination and review that in the first instance. Would you say that a motion to reopen to determine the validity of the first marriage is untimely? Certainly it's untimely. That first application was denied in 1997. Well, that's why she needs the concurrence of the service to join in the application to reopen. And then it can go back to whoever has to make that determination. And if it's determined that it is bona fide, and all the indications that I've seen point to the fact that it is, and, you know, these rules are very complex. And the immigration laws are next to the complexity of the Internal Revenue Code. And there are lots of traps out there. So why do you think that the Justice Department has a problem with agreeing to reopening? And let's see if the marriage was bona fide. Your Honor, I can't speak for the service today. I have no authority to join in the motion to reopen. I can certainly encourage the service to join, but if they choose not to do so, that's the service's prerogative. So what person makes that decision? I believe that would be the district director in Honolulu, because that's where this case originated. The district director of Honolulu? Yes, Your Honor. Okay. Do you think it would be helpful were we to refer this to mediation and ask the district director to mediate this issue? To be honest, Your Honor, I'm not sure that the service could. . . I don't think they could participate in a mediation if that's what you're suggesting. And, I mean, I can certainly try and speak to the district director, but. . . You mean it would have to be the Department of Justice who participates, of course. Correct. On behalf of the district director. You would be representing the district director in the mediation. I would have to be very honest, because this isn't something that is contemplated very often. I would have to go back and check both with the service and with my office to make sure that that is even something we could do. Normally, the service is not part of a mediation. It's usually just between the participating parties. And I believe, based on prior similar situations, that all I can do is speak with the district director's office and request that they join. But, again, it's their prerogative if they choose not to do so. And that very well may be the case here. I don't know. Right. But we've had lots of experience with this situation. And the lawyers, the Department of Justice, and the Petitioner's Council will participate in the negotiation. Certainly. Then, oftentimes, the result has been that the district director ends up joining in a motion to reopen. Certainly. That's happened several times this year alone. Okay. Well, we can certainly try to go that route here if you think that that would be the most appropriate way to resolve this case for now. No, we've had it happen. They've joined in the motion to reopen. And, I mean, we have this young, this child must be about 15 years old. Yes, Your Honor. A U.S. citizen. And we don't know where the father is, huh? I don't believe so. Probably in Guam, huh? Well, we certainly would have no objection to putting this case back into mediation if the court thinks that that's the most appropriate avenue to resolve it. Yeah. I also, I mean, I have sort of an intellectual legal problem with Kalau's decision given the legislative history. And I just think it was wrongly decided. But, I mean, I really, at this point, if you're willing to go into mediation, I don't think that doing a sua svante on Bonk Hall would be a thing to do on that case at this point. But it is also an avenue. I think Congress pretty clearly intended that Section I would be an independent avenue of adjustment. I don't know how the law got the wrong way on that. But we had a similar situation on Wednesday where the law seemed to get out of track by picking up bits and pieces of other cases. And I blame it on the law clerks. Sorry, clerks. But it so happens that the same judge on our court wrote both of those decisions. And I don't know. I think it would be best if maybe the district director reexamined what is in the situation. Absolutely, Your Honor. I got a trip to sunny California. No objections to mediation. Okay. Was the father from the Philippines? I'm not sure. Do we know? He must have. He lives on Guam? Went back to see his mother on Guam? I believe his family is from Guam. He was living in Hawaii, and he met Ms. Napudi on a trip to the Philippines. Oh, he met her on a trip to the Philippines. Yes. I'm not sure if he was originally from the Philippines, if he's from Guam, or if he was from Hawaii. But that's my understanding. Well, as far as we know, he's living in Guam. His mother was there. The last I'm aware of, yes, he was living in Guam. Petitioner's counsel might have more information than I would about his whereabouts. All right. Well, I don't think there's anything further, really. Where are you from? You're from Washington, D.C.? Yes, Your Honor. Well, enjoy the day. Thank you. I actually have another argument right now, and then some sunshine after that. Okay. Thank you. I can see you're a very kind person. Thank you. Yeah. All right. We've heard it all. Thank you very much. Do you have another argument before us today? In Courtroom 2. Courtroom who? 2. Who's the paddler? Judge Fischer? Yes. And Judge Hawkins? No, I think that might be Courtroom 3. I'd have to... Oh, 2 is Judge Reinhardt. Not Reinhardt. It's Rawlinson and Judge Rennie-Smith, and a third judge now. Tashima, maybe? Maybe. Yes. Oh, Tashima. Thank you. All right. Thank you very much. Thank you. Good luck to you on the matter that stands submitted. Thank you. And all other... Let me just... For the record, all the other matters have been submitted, except one, the submission is deferred, and the clerk has all that information. All right. With that, we'll adjourn. All rise. This court is adjourned.
judges: Pregerson, Wardlaw, Bea